UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re

      Vachira Pongvitayapanu                    Chapter  7
      aka Jimmy Lo                                Case No. 1-05-31722-jf
      aka Jimmy Pongvitayapanu,

              Debtor.

--------------------------------------------------------X

Beer Sheva Realty Corp.,

              Plaintiff,                Adv. Pro. No. 1-07-1162-jf

     - against-

Vachira Pongvitayapanu
aka Jimmy Lo,

              Defendant.
--------------------------------------------------------X

## DECISION AND ORDER DENYING DISCHARGE
## PURSUANT TO 11 U.S.C. § 727(a)(4)(A)

**APPEARANCES:**

Neal M. Rosenbloom, Esq.                Stuart P. Gelberg, Esq.
Goldberg Weprin Finkel Goldstein LLP    600 Old Country Road, Suite 410
1501 Broadway, 22nd Floor             Garden City, NY 11530
New York, NY 10036                  *Attorney for Defendant*
*Attorney for Plaintiff*

**Jerome Feller**
**United States Bankruptcy Judge**

Beer Sheva Realty Corp. ("Plaintiff"), a long-time judgment creditor of Vachira Pongvitayapanu, also known as Jimmy Lo ("Debtor" or "Mr. Lo"), objects to Mr. Lo's discharge under 11 U.S.C. § 727(a)(4)(A) on grounds that he committed false oaths in his Chapter 7 bankruptcy case with respect to his place of residence, the amount and source of his income, and his interest in a jewelry business.[1] Trial was held on December 28, 2011. After trial, the parties submitted proposed findings of fact and conclusions of law. ECF Nos. 46; 47; 48. Based on the evidence, the parties' arguments, applicable law, and the entire record, the Court sustains Plaintiff's objection to the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A). This Memorandum Decision and Order sets forth the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable here by Fed. R. Bankr. P. 7052.

## I.

At trial, neither party called witnesses. The court admitted into evidence the declaration of Plaintiff's president, Iser Abramovitz, in lieu of direct testimony, together with 34 exhibits ("Abramovitz Declaration"). ECF No. 51 at 7:15-20. The Debtor waived his right to cross-examine Mr. Abramovitz, and did not object to the admission of the Abramovitz Declaration or the exhibits attached to it, which includes deposition testimony from Mr. Lo and several of his family members. *Id.* at 7:4-5. Mr. Lo did not offer a declaration or testify on his own behalf. Instead, his counsel filed a two-paragraph affirmation for the purpose of submitting a single exhibit. ECF No. 36.

The following findings of fact are drawn from the record of this proceeding, the vast majority of which were derived from the Abramovitz Declaration and its exhibits.[2] The Debtor

---

[1] The Plaintiff's complaint (ECF No. 1) sought denial of the Debtor's discharge under numerous provisions of 11 U.S.C. § 727(a), but ultimately Plaintiff resolved to proceed under 11 U.S.C. § 727(a)(4)(A) alone.

[2] The parties' proposed findings of fact are neither pleadings nor evidence. *See, e.g.*, Fed. R. Civ. P. 7(a); *Moosman v. Hickey*, 2011 WL 1870291, at *3 (D. Utah May 16, 2011). When considering these proposed findings, the Court is ever mindful that what matters is the extent to which a proposed finding of fact is supported by evidence.

was born in Thailand in 1953. ECF No. 45-26 at 9:24-10:5. While in Thailand he married and

had a son, Viriya Pongvitayapanu ("Viriya"). *Id.* at 18:8-14. In 1979, he left Thailand for

England, and in 1983 or 1984, moved to the United States. *Id.* at 10:6-24; 49:4-5. Over the years,

three of his sisters, Pornnipa ("Pa"), Pornpimon, and Rattanavade, also moved to the United

States, as have other family members, including Viriya.

In 1984, Mr. Lo established a jewelry business called National Jewelry For Less, Inc.

("NJFL"). ECF No. 45-16 (NJFL's October 19, 1992 disclosure statement ("Disclosure

Statement") at 3). NJFL did business under the trade name Golden Apple Discount Jewelry

("Golden Apple"), and was located at 460 Sunrise Highway in Valley Stream, New York ("460

Sunrise"). *Id.*[3] Mr. Lo started NJFL using $400,000 he received from his father, a resident of

Thailand. ECF No. 45-26 at 50:24-51:14. NJFL remained in business for some 10 years, and at

one time had assets valued at $1 million. *Id.* at 53:3-18.

The Debtor also played a role in the formation of Siam Jewelers Inc. ("Siam"), a

company incorporated in 1986 or 1987, and purportedly owned by Sam Speciale ("Sam") and

Mr. Lo's sister, Rattanavade. ECF No. 45-26 at 41:21-25; 57:16-58:11. Mr. Lo claims not to

have had an interest in Siam, but he helped incorporate it, signed documents as its president, and

allowed it to use the Golden Apple trade name. *Id.* at 58:23-59:7; ECF No. 45-27 at 84:3-89:24.

Mr. Lo testified that after Sam passed away, he may have had a role in forming, and may have

had a position at, a related business called Three S Jewels ("Three S"). ECF 45-27 at 89:25-

92:21. NJFL sold merchandise to Three S. *Id.* at 91:3-25. According to Mr. Lo, Three S went out

of business in 1993. *Id.* at 92:16-21.

In July 1987, the Debtor purchased a home located at 301 South Great Neck Road in

Copiague, New York ("Copiague Property"). *Id.* at 101:23-102:17. The Debtor paid between 15

---

[3] For a short time, NJFL also had a second store in Carle Place, New York. ECF No. 45-27 at 105:13-106:11.

and 20 percent of the approximately $300,000 purchase price in cash, and used a mortgage loan for the balance. *Id.* at 102:2-25; ECF No. 45 ¶ 23. He later received a home equity loan of between $75,000 and $80,000, which he invested in NJFL. ECF No. 45-27 at 103:9-18. Pa and Pornpimon moved into the Copiague Property at around the same time as the Debtor. ECF No. 45-3 at 13:19-15:10.[4]

In January 1991, the Sheriff of Nassau County seized over $300,000 worth of NJFL's jewelry, as a result of a debt owed to Newsday, Inc. ECF No. 45-16 (Disclosure Statement at 3). On March 11, NJFL filed for Chapter 11 bankruptcy protection, and was represented by Stuart P. Gelberg, Esq. ("Gelberg"). Mr. Lo asserted a claim of $428,226, based on loans he purportedly made to NJFL. *Id.* (Disclosure Statement at 8). NJFL reported that in July of that year its store was robbed at gunpoint and "did not have insurance against the large loss in the amount of $261,416.00 . . . ." *Id.* (Disclosure Statement at 4).

In August 1991, shortly after the NJFL robbery, Mr. Lo married Jantima Ampawa ("Jantima") in Mount Vernon, New York. ECF No. 45-13 at 23:19-25; 31:16-18. They had a daughter together in 1995 or 1996, but are now separated. On August 9, 1991, Mr. Lo incorporated Jewelnoff Inc., which operated out of 460 Sunrise and may have used the Golden Apple trade name. ECF Nos. 45-26 at 74:11-14; 45-27 at 80:23-81:6.

Plaintiff claims that on October 1, 1991, Mr. Lo defaulted on the second mortgage loan on the Copiague Property held by Metropolitan Investors Co. ("Metropolitan"). ECF No. 45 ¶ 23. NJFL's tax returns for the period November 1, 1991 through October 31, 1992, and the period November 1, 1992 through December 31, 1993, list payments to Mr. Lo and Pa under "Compensation of Officers." ECF Nos. 45-30; 45-31; 45-3 at 39:19-40:14; 43:19-44:16. NJFL's

---

[4] In 1988 or 1989, the Debtor and the principal of one of his suppliers opened a short-lived business called Lo & L Corp. ECF No. 45-26 at 59:8-60:6. It was located on Queens Boulevard and used the Golden Apple trade name. ECF No. 45-27 at 86:20-22.

Disclosure Statement claims that Pa earned a salary similar to what was reported in the tax returns. ECF No. 45-16 (Disclosure Statement at 12). However, Pa testified that she was not an officer of NJFL, never received a salary, and that by 1991 no longer worked there. ECF No. 45-3 at 39:19-50:12. Pa stated that the false statements in NJFL's tax returns were made to help her fulfill the requirements of an E-2 visa, and, even though she was not being paid, Mr. Lo paid her income taxes based on the fictitious salary that was reported. *Id.* at 45:15-24; 49:8-50:12.

Notwithstanding the July 1991 robbery, the Disclosure Statement indicated in October 1992 that the return of the merchandise seized by Newsday would allow NJFL to "dramatically increase [its] net income;" NJFL had net income of $16,005 in December 1991; and NJFL's "prospects for reorganization seemed to be good." ECF No. 45-16 at 4, 5. The Disclosure Statement also indicates that Mr. Lo personally paid the fees of NJFL's counsel and accountant and that Pa paid Chemical Bank's unsecured claim of $20,000. *Id.* at 6, 7.

Mr. Lo claims that NJFL was robbed again sometime in 1992 or 1993. ECF No. 45-26 at 36:2-9; 54:20-55:2. According to Plaintiff, in March 1993, Metropolitan brought a foreclosure proceeding based on a debt of some $90,000. ECF No. 45 ¶ 23. On January 10, 1994, a final decree was issued in NJFL's bankruptcy case based on the substantial consummation of its plan. ECF No. 45-16. On March 21, Plaintiff obtained a personal judgment against Mr. Lo in the amount of $285,000. ECF No. 45 ¶ 2. Just weeks before, on March 10, Pa purchased the Copiague Property at a foreclosure sale for $125,000, subject to a first mortgage held by Citibank. ECF Nos. 45-29; 45 ¶ 23. Pa testified in 2006 that the Copiague Property had been appraised at $1.6 million and that she had received over $1 million in mortgage loans based on the equity in the property. ECF No. 45-3 at 85:20-86:20.

According to Mr. Lo, NJFL was robbed for a third time sometime in 1994, and went out of business in early 1995. ECF Nos. 45-26 at 54:20-56:25; 45 ¶ 12. On March 9, 1995, the

Debtor and a diamond dealer formed Best Jewelry Outlet, Inc. ECF Nos. 45-17; 45-26 at 56:16-57:15. Mr. Lo testified that the company operated out of 460 Sunrise, but after a dispute, his partner left in early 1996 and the business closed. ECF No. 45-17 at 94:11-95:19.

On May 30, 1996, the Debtor's son Viriya incorporated Best Jewelry Outlet Manufacturing, Inc. ("Best Jewelry"), which also opened at 460 Sunrise. ECF Nos. 45-2; 45-27 at 94:11-95:24; 45-1 at 14:9-21. At the time, Viriya was a 22-year-old college student without business experience. ECF No. 45-1 at 14:11-15:6; 42:13-44:7. Best Jewelry utilized the same phone number, Golden Apple trade name, signage, suppliers, accountants, and fixtures, including a vault and safes, as the Debtor's former businesses. *See, e.g.*, ECF Nos. 45-27 at 111:9-113:2; 114:10-115:20; 118:24-119:6; 121:3-123:2; 45-1 at 47:12-48:24; 70:4-21; 72:23-73:6; 80:14-81:13. Mr. Lo also had access to Best Jewelry's vault, safes, and alarm system. ECF No. 45-27 at 118:11-13. Viriya and the Debtor both contend that Viriya was the sole owner of Best Jewelry, and that the Debtor was never an owner, officer, or employee. *See, e.g.*, ECF No. 47 ¶¶ 10-21.

In a letter to Consumer Home Mortgage Inc. ("Consumer Home") dated September 14, 1998, Mr. Lo certified as "owner" of Best Jewelry that Jantima's mother, Maliwon Aumpava ("Maliwon"), earned an annual salary of $60,000 at Best Jewelry. ECF No. 45-7. He also signed, as owner, a "Request for Verification of Employment" for Consumer Home. ECF No. 45-8. This document indicates that Maliwon was a "Jewelry Designer" and that she had been employed at Best Jewelry since 1991.[5] Jantima testified that Maliwon never worked at Best Jewelry. ECF No. 45-14 at 54:9-56:5. In October 1998, Maliwon received a mortgage loan from Consumer Home to purchase a house at 1565 East 58th Street in Brooklyn, New York ("Brooklyn Property"). ECF No. 45-36.

---

[5] The Debtor signed additional employment verification forms for Maliwon on April 13, 2000 and August 3, 2000. ECF Nos. 45-9; 45-10.

Maliwon, together with Jantima and the Debtor's daughter, moved into the Brooklyn Property from where they had been living together in Park Slope, Brooklyn. ECF Nos. 45-13 at 13:12-16; 45-14 at 59:9-14; 64:15-65:10; 77:24-78:5. Jantima does not indicate that Mr. Lo was also living with her in Park Slope or that he moved into the Brooklyn Property. Likewise, Mr. Lo does not claim to have ever lived in Park Slope. In February 1999, just months after Maliwon's purchase of the Brooklyn Property, Jantima filed a petition for relief under Chapter 7 of the Bankruptcy Code. ECF No. 45-20. In her filing, she lists the Brooklyn Property as her address, and provides the Copiague Property as Mr. Lo's address. *Id.* She received a discharge on May 11, 1999.

A "Telephone Verification of Employment" form dated March 11, 2004, indicates that Jantima was employed at "Best Jewelry." ECF No. 45-11. Jantima is described as a manager and is said to have worked at the company for "about 9 years." *Id.* Mr. Lo is referred to as the "owner" of Best Jewelry. *Id.* Just weeks later, Jantima purchased the Brooklyn Property from her mother. ECF No. 45-14 at 66:9-21.

Viriya's 2004 federal income tax return lists his home address as the Copiague Property and states that he was self-employed in 2004. ECF No. 45-4. The tax return indicates that he worked for two companies, and does not mention Best Jewelry. Best Jewelry's 2004 federal tax return indicates gross receipts or sales of $182,464 and a gross profit of $63,247. ECF No. 45-21. Best Jewelry's 2004 New York State tax return lists two employees, including Jantima. According to the return, Jantima earned gross wages of $22,750. *Id.*

Mr. Lo provided the Copiague Property as his home and business addresses on his 2004 and 2005 federal tax returns. ECF No. 45-19. The Copiague Property is also listed as his mailing address on his 2004 and 2005 New York State tax returns. *Id.* Mr. Lo indicated on his 2004 federal tax return that he was a marketing consultant and had gross receipts of $4,800 and total

expenses of $3,496. *Id.* His federal return for 2005 again states that he is a marketing consultant, this time with gross receipts of $4,356 and total expenses of $3,457. *Id.* Neither Best Jewelry nor the Brooklyn Property is listed on Mr. Lo's 2004 and 2005 tax returns.

In May 2005, Mr. Lo signed a layaway deposit slip as cashier for Golden Apple. ECF No. 40-1. On June 13, 2005, Best Jewelry filed a petition for relief under Chapter 11 of the Bankruptcy Code, which case was assigned to the Long Island Federal Courthouse in Central Islip, New York. Case No. 05-84088, ECF No. 1. Viriya signed the petition as president, and gave the Copiague Property as his address. Case No. 05-84088, ECF No. 10 (Statement of Financial Affairs ("SOFA") Item 21). Best Jewelry scheduled $226,750 in assets, including a $5,000 rent deposit; $2,950 in showcases, shelving, and other equipment; and $215,000 in jewelry. *Id.* (Schedule B – Personal Property ("Schedule B")).

On July 18, 2005, the United States Trustee made a motion to convert the case to Chapter 7. Case No. 05-84088, ECF Nos. 11; 12. At a hearing on August 3, Best Jewelry was ordered to file a consignment list within 10 days. On October 14, while the motion to convert Best Jewelry's case was still pending, Mr. Lo, represented by counsel, filed his Chapter 7 petition in Brooklyn. The meeting of creditors under 11 U.S.C. § 341(a) was scheduled for December 2. Case No. 05-31722, ECF No. 2. On November 10, Best Jewelry's case was converted to a case under Chapter 7, and a meeting of creditors was scheduled for December 14. Case No. 05-84088, ECF Nos. 16; 17. On November 21, Gelberg filed a notice of appearance in Best Jewelry's case and disclosed that Mr. Lo paid him $1,500 in legal fees. ECF No. 40-2.

On November 28, Best Jewelry's Chapter 7 trustee sought to have Viriya designated as the principal of Best Jewelry. Case No. 05-84088, ECF No. 25. The trustee in Mr. Lo's case held a meeting of creditors on December 2, and filed a report of no distribution three days later. On December 13, Best Jewelry's Chapter 7 trustee sought to compel Viriya to deliver and account

for property of Best Jewelry, including cash and jewelry. Case No. 05-84088, ECF No. 29.

Trustee's counsel stated that he was troubled that:

> [T]he debtor's principal . . . had been giving receipts for additional
> layaway deposits to customers on receipts from Golden Apple
> Discount Jewelry Store which, according to the receipts, operates
> out of the same premises as the debtor. . . .  The debtor has
> provided no explanation as to who Golden Apple is, whether
> Golden Apple has separate records, separate accounts or separate
> property, or whether the debtor had been siphoning off the debtor's
> business to Golden Apple during the time period in which the
> debtor was operating under Chapter 11.

*Id.* ¶ 7. The Golden Apple layaway slip signed by Mr. Lo in May 2005 was attached as an exhibit

to the trustee's motion. On December 20, an order was entered granting the trustee's motions.

Case No. 05-84088, ECF No. 35. A month later, Best Jewelry's inventory was sold at public

auction, yielding the gross sum of $40,017. Case No. 05-84088, ECF No. 37.

The Debtor lists his "Street Address" as the Brooklyn Property and his "County of

Residence" as Kings on the petition. Case No. 05-31722, ECF No. 1. On Schedule I – Current

Income of Individual Debtor(s) ("Schedule I"), he states that he has been employed as a

salesman at Best Jewelry for three years, and indicates that his combined monthly income is

$700, consisting of $500 in salary from Best Jewelry and $200 in "[f]amily [a]ssistance." *Id.* On

Schedule J – Current Expenditures of Individual Debtor(s) ("Schedule J"), he lists total monthly

expenses of $820. *Id.* His expenses include $100 in "[p]ayments for support of additional

dependents not living at your home." *Id.* On Schedule B, he lists $910 in assets, including $10 in

cash, $100 in a checking account, and $750 in household goods. *Id.* In 2007, Gelberg was

substituted as Mr. Lo's counsel. Case No. 05-31722, ECF Nos. 32; 35. On June 18, 2008, over a

year after this adversary proceeding was filed, the Debtor filed amended Schedules I and E, and

an amended SOFA. Case No. 05-31722, ECF Nos. 47; 48.

## II.

Chapter 7 of the Bankruptcy Code is designed to provide individual debtors the opportunity for a "fresh start" through the discharge of personal liability for pre-petition debts. At its best, a discharge is nothing less than transformative – it provides "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). But "[t]he discharge of a bankrupt from his debts is a privilege or favor that has been granted by Congress upon such terms as it has seen fit to impose." *In re Stone*, 172 F. Supp. 142, 146 (E.D.N.Y. 1959). Among these terms is the requirement that debtors act in good faith and provide full and honest disclosure. For this reason, it is often said that the discharge is a privilege reserved for the "'honest but unfortunate debtor.'" *Marama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

To ensure complete candor, a debtor is required to sign the petition under the penalty of perjury. That oath "must be regarded as serious business." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 112 (1st Cir. 1987). Debtors who are dishonest or reckless with the truth proceed at their own peril. As one court explains:

> Dishonesty can bring severe consequences, including revocation of discharge and civil sanctions. *See* 11 U.S.C. § 727(d) (stating that a debtor's discharge may be revoked if it was obtained by fraud); *Estate of Perlbinder v. Dubrowsky (In re Dubrowsky)*, 206 B.R. 30, 37 (Bankr. E.D.N.Y. 1997) (awarding sanctions against debtor who provided false information in his schedules and statement of financial affairs). And the knowing and fraudulent concealment of property belonging to the estate of a debtor is a federal crime punishable by a fine, a prison term of up to five years, or both. *See* 18 U.S.C. § 152; *United States v. Shadduck*, 112 F.3d 523, 532 (1st Cir. 1997) (affirming convictions of debtors who concealed bank account).

*In re Arana*, 456 B.R. 161, 169 (Bankr. E.D.N.Y. 2011). In addition to utmost honesty, the

Bankruptcy Code and applicable rules demand robust disclosure. Debtors must reveal "far more information than would be required to defend a creditor's collection action, or in most other civil litigation." *Arana*, 456 B.R. at 169 (stating that "[t]he price of a discharge in bankruptcy is high, and the disclosure requirements of the Bankruptcy Code and Rules are onerous indeed").

Such disclosure is essential to bankruptcy administration. "The bankruptcy schedules and statements of affairs are carefully designed to elicit certain information necessary to the proper administration and adjudication of the case." *Siegel v. Weldon (In re Weldon)*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995). As this Court has explained, "[f]ull and honest disclosure" is required as it "is crucial to the effective functioning of the bankruptcy system. Because the bankruptcy court, trustees, and creditors rely on the information disclosed by a debtor, the importance of full disclosure cannot be overemphasized." *In re Lowery*, 398 B.R. 512, 515 (Bankr. E.D.N.Y. 2008); s*ee Tully*, 818 F.2d at 112 (stating that "[i]n bankruptcy administration, the system will collapse if debtors are not forthcoming").

Good faith compliance serves other vital purposes as well. As explained by the Second Circuit, "[t]he good faith standard applied to bankruptcy petitions furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997) (internal quotation marks omitted). The good faith standard also "protects the jurisdictional integrity of the bankruptcy courts by rendering their powerful equitable weapons (*i.e.*, avoidance of liens, discharge of debts, marshaling and turnover of assets) available only to those debtors and creditors with 'clean hands.'" *Clear Blue Water, LLC v. Oyster Bay Mgmt. Co.*, 476 B.R. 60, 68 (E.D.N.Y. 2012) (internal quotation marks omitted); s*ee also Cho v. Park (In re Park)*, 480 B.R. 627, 639 (Bankr. D. Md. 2012) ("The truth of the schedules and the

openness of the process is a laudable goal in and of itself.").

Various sections of the Bankruptcy Code are designed "to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *Tully*, 818 F.2d at 110. To this end, 11 U.S.C. § 727(a)(4)(A) provides:

> (a)  The court shall grant the debtor a discharge, unless–
>
> . . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case–
>
> (A) made a false oath or account . . . .

11 U.S.C. § 727(a)(4)(A). To establish a claim under Section 727(a)(4)(A), a plaintiff must prove a material false oath, knowingly and fraudulently made, in connection with a bankruptcy case. *See, e.g.*, *O'Connell v. DeMartino (In re DeMartino)*, 448 B.R. 122, 127 (Bankr. E.D.N.Y. 2011). At trial, the plaintiff has the burden of proving each of the elements by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *see also Grogan*, 498 U.S. at 291.

Because denial of a discharge is a harsh sanction, courts construe these factors strictly in favor of the debtor. *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996). The vast majority of the hundreds of thousands of debtors who file Chapter 7 petitions each year fall into the class of "honest but unfortunate" debtors who are eligible to receive a discharge. *See generally Marama*, 549 U.S. at 374. Unfounded attempts by overzealous creditors to hamstring a debtor's fresh start are not to be countenanced. *See, e.g.*, *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934) (stating that "[t]he reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural"); *Dribusch v. Zebrowski (In re Zebrowski)*, 2012 WL 5289941, at *5 (Bankr. N.D.N.Y. Oct. 25, 2012) (noting that "[a] discharge may not be denied under § 727(a)(4)(A) where the untruth was a result of mistake or inadvertence").

However, when a plaintiff produces "persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation." *Desiderio v. Parikh (In re Parikh)*, 456 B.R. 4, 28 (Bankr. E.D.N.Y. 2011) (internal quotation marks omitted). *See TD Bank v. Nazzaro (In re Nazzaro)*, 2013 WL 145627, at *6 (Bankr. E.D.N.Y. Jan. 14, 2013) ("While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a *prima facie* case.") (internal quotation marks omitted); *see also Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991) ("[T]he policy in favor of providing the honest debtor with a fresh start must be weighed against the countervailing policy of ensuring that dependable information is available to those interested in the administration of the bankruptcy estate").

A false statement or omission in the debtor's petition, schedules, or statements, satisfies the requirement of a false oath. A false statement or omission is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam). It is well settled in the Second Circuit that "'[m]ateriality does not require a showing that the creditors were prejudiced by the false statement.'" *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 229 (E.D.N.Y. 2000) (quoting *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974)).

Debtors are not permitted to omit information based on their assessment of its value or lack thereof. Allowing debtors the "discretion" to choose the information that is worth disclosing "would create an end-run around [the] strictly crafted system" of bankruptcy administration. *Weldon*, 184 B.R. at 715; *see also Fokkena v. Peterson (In re Peterson)*, 356 B.R. 468, 478 (Bankr. N.D. Iowa 2006) (stating that "debtors have an 'absolute duty to report whatever

interests they hold in property, even if they believe their assets are worthless'") (quoting *Kasden v. Kasden (In re Kasden)*, 209 B.R. 239, 243-44 (B.A.P. 8th Cir. 1997)). Finally, the Bankruptcy Code does not contemplate "a 'no-harm, no-foul' exception for small estates." *Hatton v. Spencer (In re Hatton)*, 204 B.R. 477, 485 (E.D. Va. 1997).

A statement is made with knowledge of its falsity if the debtor knew it to be false or if it was made with reckless disregard for its truth. *D.A.N. Joint Venture v. Cacioli (In re Cacioli)*, 285 B.R. 778, 784 (Bankr. D. Conn. 2002). Fraudulent intent "'involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression.'" *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000) (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)). "Fraudulent intent may be inferred from the circumstances of the case. Such circumstances may include inferences from the debtor's conduct, all surrounding circumstances, and the apparent course of conduct." *Nozarro*, 2013 WL 145627, at *7 (internal citation and quotation marks omitted). Reckless disregard or indifference to the truth may also demonstrate fraudulent intent. *See Keeney*, 227 F.3d at 686; *Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969) (per curiam). And "[f]raudulent intent may be inferred if the false statement is not explained satisfactorily." *Malicki v. Bernstein (In re Bernstein)*, 447 B.R. 684, 702 (Bankr. D. Conn. 2011).

## III.

Plaintiff's version of events weaves a conspiracy among the Debtor, Viriya, Pa, and Maliwon to conceal the Debtor's assets by transferring ownership of the Copiague Property to Pa and the Debtor's jewelry business to Viriya. The Debtor's version is that he owned NJFL for some 10 years, but after a series of unfortunate events and failed businesses, he has been rendered destitute, and even forced at times to collect cans to make ends meet. From Mr. Lo's perspective, any errors made in his bankruptcy filing are harmless because he has nothing of

value to hide – Pa owns the Copiague Property; Best Jewelry was Viriya's and, in any event, was liquidated in Chapter 7; and his income, whatever the actual amount, is so small that is inconsequential to his creditors. *See, e.g.*, ECF No. 47 ¶¶ 25-26.

In this rather unusual litigation, the parties did not testify at trial. The Court therefore cannot make credibility determinations based on live testimony. At the same time, the uncontroverted evidence that has been submitted raises legitimate concerns about Mr. Lo's credibility. It appears that NJFL's 1991 and 1992 tax returns falsely list Pa as a salaried officer for the purpose of satisfying her E-2 visa requirements. ECF Nos. 45-3 at 39:19-50:12; 45-30; 45-31. That falsehood was repeated in NJFL's bankruptcy case. ECF No. 45-16 (Disclosure Statement at 12). Such *modus operandi* was apparently not foreign to Mr. Lo. He testified that Jewelnoff was created for the sole purpose of helping an employee of NJFL obtain a green card. ECF No. 45-26 at 61:18-62:12; 69:23-70:15.[6] Likewise, he provided false or misleading employment verification reports on behalf of Maliwon and Jantima to help them secure mortgage loans to purchase the Brooklyn Property. ECF Nos. 45-7; 45-8; 45-9; 45-10; 45-11. Mr. Lo signed these and other documents as "owner" of Best Jewelry, contrary to the position he has taken in this proceeding. He admits to similar conduct with respect to Siam. ECF No. 45-27 at 84:3-89:24. And his 2004 and 2005 tax returns plainly contradict the information he included in his petition, statements, and schedules regarding his address, place of employment, and income.

The record shows that Mr. Lo is an experienced businessman. He established multiple corporations and assisted family members in connection with their businesses. He comes from a family of apparent considerable wealth, having received $400,000 from his father when he first

---

[6] Another example of Mr. Lo's lack of credibility also relates to Jewelnoff. The Debtor testified at his deposition that Jewelnoff was never operational and that it did not have any assets. ECF No. 45-26 at 61:18-62:3; 69:8-70:15. However, when confronted with his sworn affidavit in connection with litigation involving the Plaintiff that contradicted that testimony, Mr. Lo could not provide a credible or coherent explanation. *Id.* at 71:5-74:25; ECF No. 45-27 at 75:2-81:6.

came to the United States, and hundreds of thousands more following his father's death. ECF

Nos. 45-26 at 50:24-51:14; 45-27 at 82:6-24. Mr. Lo cannot, therefore, be characterized as naïve

or unsophisticated. Furthermore, he was represented by counsel in his bankruptcy. Yet there are

numerous inconsistencies in his filings, as well as questions concerning the completeness of his

disclosures. *See, e.g.*, *Sapru*, 127 B.R. at 316-17.

Finally, the Court must also consider the way in which the Debtor has elected to defend

this lawsuit. The Plaintiff has made showings that raise serious concerns about the Debtor's

conduct in his bankruptcy case. Yet, Mr. Lo's responses come through counsel, fail to address

serious allegations, are often opaque, and, at times, flippant. It is clear that "[a] debtor cannot,

merely by playing ostrich and burying his head deeply enough in the sand, disclaim all

responsibility for statements which he has made under oath." *Tully*, 818 F.2d at 111.

## IV.

Bankruptcy Official Form 1 required the Debtor to disclose his "Street Address," "County

of Residence," and "Mailing Address . . . (if different from street address)." Case No. 05-31722,

ECF No. 1 (Petition). Mr. Lo indicated that his county of residence was "Kings" and that his

street address was the Brooklyn Property. *Id.* He did not provide a response to the request for a

mailing address and under "Location of Principal Assets of Business Debtor," he listed the

Brooklyn Property. *Id.*

Plaintiff argues that listing the Brooklyn Property as his residence was a false oath,

because Mr. Lo's true residence is the Copiague Property. ECF No. 46 ¶¶ 1-9. Plaintiff points

out that (i) in her deposition, Jantima did not indicate that the Debtor resided with her at the

Brooklyn Property (*Id.* ¶ 5); (ii) in her bankruptcy filing, Jantima stated that the Debtor resided at

the Copiague Property (*Id.* ¶ 4); (iii) the Debtor listed the Copiague Property as his address on

his 2004 and 2005 tax returns (*Id.* ¶ 7); and (iv) the Debtor purchased the Copiague Property in

1987, and it has been his long-term residence (*Id.* ¶ 6). Plaintiff contends that Mr. Lo's

dishonesty is intentionally fraudulent based on these facts as well as the circumstances

surrounding Pa's purchase of the property. *See, e.g.*, ECF No. 48 ¶ 11. Further, Plaintiff asserts

that Pa's testimony that the Copiague Property is worth some $1.6 million satisfies the

materiality requirement. *Id.*

Plaintiff attempts to cast doubt on the validity of Pa's purchase of the Copiague Property. It

notes that when Mr. Lo owned the property, Citibank held a $175,000 first mortgage, and

Metropolitan held an $81,500 second mortgage. ECF No. 45 ¶ 23. According to Plaintiff, Mr.

Lo's monthly payments were $2,086 to Citibank and $1,154 to Metropolitan, and "[t]he Debtor

made all payments until October 1, 1991 when the Debtor defaulted on the second mortgage." *Id.*

The Plaintiff continues:

> Although the Debtor continued to pay Citibank the $2,086.26
> every month on the first mortgage, the second mortgagee
> commenced a foreclosure action seventeen (17) months after the
> initial default, on or about March 25, 1993 for the sum of
> $89,996.50. Incredibly the Debtor testified that there was a
> foreclosure because he had a business problem and could not pay
> his mortgage, yet he continued to pay Citibank $2,086.26 until the
> foreclosure sale. The Debtor also had money to pay his attorneys
> and accountant in the NJFL Bankruptcy.

*Id.* (internal citations omitted). After making allegations concerning the conduct of the sale and

Metropolitan's issuance of a post-sale mortgage to Pa notwithstanding Mr. Lo's prior default,

Plaintiff states that "[i]t shocks the imagination to believe that [Pa] was able to obtain a first and

second mortgage . . . when she testified at her deposition that she worked for NJFL from 1988

when she first arrived in America on an E2 visa until 1994, but never got paid." *Id.* ¶ 26 (internal

citations omitted). In other words, Plaintiff believes that the purchase of the Copiague Property

was part of a scheme orchestrated by Mr. Lo to hide assets from his creditors.

The Debtor, through his counsel, claims that he resided at both the Brooklyn Property and

the Copiague Property. ECF No. 47 ¶ 3. According to the Debtor's counsel:

> The Debtor was not making a false statement when he listed
> Brooklyn as his residence in his bankruptcy petition. The saying
> "home is where the heart is" should apply to the Debtor. He sleeps
> several days a week on a rug in his daughter's room and this is the
> address he considers his home. He receives no advantage by lying
> about his address.

*Id.* ¶ 6. With respect to Plaintiff's allegations and evidence concerning the circumstances under

which the Copiague Property was purchased by Pa, Debtor's counsel states that the sale occurred

over ten years before the Debtor filed his petition, has never been challenged, and that Plaintiff's

arguments are based on nothing more than "innuendo." *Id.* ¶ 9.

Plaintiff need not prove its grand conspiracy to prevail in this case. Based on the entire

record, the elements of 11 U.S.C. § 727(a)(4)(A) have been satisfied with respect to Mr. Lo's

failure to list the Copiague Property in his filing. At his June 15, 2006 deposition, he testified as

follows:

> Q.    You gave your address just now as 1565 East 58th Street in
>       Brooklyn; is that correct?
> A.    Yes.
> Q.    Do you live at any other addresses?
> A.    Yes.
> Q.    How many others?
> A.    One.
> Q.    What is that address?
> A.    301 South Great Neck Road.
> Q.    Is that in Copiague?
> A.    Yes.
> Q.    You actually reside at both places?
> A.    Yes.
> Q.    How long have you lived at the Brooklyn address?
> A.    Four years. Not really stay there all the time, but in and out
>       between 301 and this.
> Q.    You split your time between those places?
> A.    Yes.
> Q.    But you have been living part-time at the Brooklyn address
>       for at least two or three days?
> A.    Yes.
> Q.    How long have you lived in Copiague? How many years?

A.      About 18 years, 15 years. 15 years.

ECF No. 45-26 at 7:4-8:10. Mr. Lo further testified that he does not have a room at the Brooklyn

Property, and instead sleeps in his daughter's room on a "small rug on the floor." *Id.* at 16:12-14.

Consistent with this, Jantima testified that Mr. Lo stayed at the Brooklyn Property "[o]n and off,"

for "a few days" at a time to visit their daughter, and that he slept in their daughter's room during

these visits. ECF No. 45-13 at 24:17-26:11. Jantima was also adamant that she and Mr. Lo did

not have a good relationship. *Id.* The *ad hoc* nature of his sleeping situation at the Brooklyn

Property, his long-term residence and former ownership of the Copiague Property as compared

to his four-year relationship to the Brooklyn Property, and his use of the Copiague Property as a

home, mailing, and business address in his 2004 and 2005 tax returns, would seem to require the

Debtor to list the Copiague Property as his address and Suffolk as his county of residence.

The Debtor argues that it was not false to list the Brooklyn Property as his street address,

and Brooklyn as his county of residence, because he resides at both properties and considers the

Brooklyn Property to be his true "home." ECF No. 47 ¶¶ 3, 6. Not only does the premise that Mr.

Lo considers the Brooklyn Property his true "home" appear disingenuous based on the record,

his argument does not rebut the falsity of failing to disclose the Copiague Property for two

reasons. First, in order to establish a change in domicile, a person must have a "physical presence

at the new location along with an intention to remain there indefinitely or the absence of any

intention to go elsewhere." *The Cadle Co. v. Leffingwell (In re Leffingwell)*, 279 B.R. 328, 341

(Bankr. M.D. Fla. 2002) (internal quotation marks omitted). On the facts of this proceeding,

including his long-term connection to the Copiague Property, his off-and-on presence at the

Brooklyn Property, and his estrangement with Jantima, even if Mr. Lo *resides* at both the

Brooklyn Property and the Copiague Property, there is no basis to conclude that he established a

*new domicile* at the Brooklyn Property. *See Leffingwell*, 279 B.R. at 341-42.

Second, and perhaps more importantly, the Debtor's argument does not take into consideration that omissions as well as affirmative statements can qualify as material false oaths under 11 U.S.C. § 727(a)(4). In fact, the dual-residence argument only supports the conclusion that the failure to disclose the Copiague Property violates this provision: there is no question that if Mr. Lo resided at both properties, then, perforce, he had an obligation to disclose *both* of those residences in his case. The reasons for this go to the heart of bankruptcy disclosure. Mr. Lo's concealment of the Copiague Property rendered his petition, statements, and schedules misleading and unreliable. This in turn interfered with the ability of the trustee and creditors to make a fair assessment of his financial condition and forestalled even routine inquiries arising from his long-term residence at the Copiague Property.

The misleading nature of the omission of the Copiague Property can be illustrated by reference to Mr. Lo's seemingly innocent disclosure on Schedule B that he had $750 in "household goods." Case No. 05-31722, ECF No. 1. As he had not disclosed the Copiague Property, the Court, the trustee, and creditors naturally would have assumed that Mr. Lo's meager household goods were located at the Brooklyn Property; but had he disclosed the Copiague Property, that assumption was not a foregone conclusion. At the very least, the disclosure of the Copiague Property would have provided grounds for the trustee and creditors to consider whether the Debtor's household goods were located in Brooklyn or in Copiague. Similarly, the Debtor's association with expensive real property in Copiague might have engendered inquiry into the value of his personal property. Based on the "hindsight" afforded by the record of this litigation, it is clear that the location and amount of the Debtor's assets are fair grounds for scrutiny.

There is no question that the nature, location, and amount of Mr. Lo's personal property are material to the administration of his bankruptcy case. This is the case even if Mr. Lo's

household goods were only worth $750 and were located at the Brooklyn Property. *See, e.g.*, *Robinson*, 506 F.2d at 1188 (explaining that a false oath is material when it relates to "discovering what, if any, assets [the debtor] may have had"). The Copiague Property is also material to the sources and extent of his income. Mr. Lo reported doing business from the property in his 2004 and 2005 tax returns. ECF No. 45-19. And, now that he has amended his Schedule I and SOFA, contends that his sole source of income is the gifts he receives from his son and two sisters, all of whom live at the Copiague Property. *See, e.g.*, ECF Nos. 47 ¶¶ 18-19; 45-27 at 114:2-9.[7]

The Debtor's omission of the Copiague Property is material for the additional reason that a debtor's address determines the venue of a case, including the division within a district to which the case is assigned. *See, e.g.*, *Leffingwell*, 279 B.R. at 348-49 (determining that the use of an address that caused the case to be assigned to a different division within the Middle District of Florida was material under 11 U.S.C. § 727(a)(4)(A)). When the Debtor filed, E.D.N.Y. LBR 1002-1(a) directed debtors with addresses in Kings County to file their petitions in Brooklyn and those with addresses in Suffolk County to file in Central Islip. Mr. Lo's case was assigned to this Court because he indicated that he resided in Kings County, and it would have been assigned to the Central Islip division if he had listed the Copiague Property as his residence. *See* E.D.N.Y. LBR 1073-1(a)(i) (effective July 1, 1999). Furthermore, failing to list the Copiague Property, an address that he admittedly considers a residence, is material for the related reason that it denied the Court, the trustee, and creditors the opportunity to assess whether this case should have been reassigned to Central Islip. *See* E.D.N.Y. LBR 1005-1 (effective July 1, 1999) ("If the debtor's

---

[7] Focusing only on Plaintiff's argument that the omission of the Copiague Property is material because it is a potential $1.6 million asset of the estate, Mr. Lo's counsel contends that materiality has not been established because Pa's purchase of the Copiague Property occurred a decade before Mr. Lo filed his case and has never been challenged. ECF No. 47 ¶ 9. This argument rings hollow. The concealment of the Copiague Property prevented the trustee from exploring the transaction and assessing whether there was a basis to pursue this potential asset.

post office address is not the debtor's residence or place of business, the petition shall also state the debtor's residence or place of business."); E.D.N.Y. LBR 1073-1(d)  (effective July 1, 1999) ("The Judge to whom a case was originally assigned may refer the case to the Clerk for reassignment."); E.D.N.Y. LBR 1073-1(f) (effective July 1, 1999) ("[T]he Chief Judge may, in the interests of justice or the proper administration of the Court, assign or re-assign . . . cases").

Reassignment may have been appropriate for a number of reasons, including the Debtor's connection to the Copiague Property and Best Jewelry's pending bankruptcy case in Central Islip. Whether the result of gamesmanship or not, omitting the Copiague Property from his petition and filing in Brooklyn obscured the connection between his case and Best Jewelry's case and avoided the possible assignment of his case to the same trustee. One obvious link would have been that Best Jewelry's ostensible principal and Mr. Lo resided at the same address. Another was that Mr. Lo's name appeared on the record of Best Jewelry's case when Gelberg appeared on behalf of Best Jewelry and disclosed that Mr. Lo had paid him $1,500 for Best Jewelry's legal fees. ECF No. 40-2. This payment would no doubt have been of interest to the trustee in Mr. Lo's case given the meager income and assets he scheduled. In addition, Mr. Lo's name appeared on the May 2005 Golden Apple layaway slip. This layaway slip was an exhibit to a motion made by Best Jewelry's Chapter 7 trustee that raised serious concerns about whether Best Jewelry was hiding or transferring its assets to Golden Apple, a trade name used by Mr. Lo since the 1980s. *See* Case No. 05-84088, ECF No. 29.[8]

---

[8] Apart from Mr. Lo's contested ownership of Best Jewelry, Plaintiff's allegations concerning Best Jewelry raise questions about whether he truthfully disclosed all of his assets. One question is whether Mr. Lo had an interest in the safes, fixtures, and merchandise belonging to his former businesses that were transferred to Best Jewelry when it took over the space at 460 Sunrise. *See* ECF Nos. 45-27 at 111:9-113:2; 45-1 at 47:12-48:24; 72:23-73:6; 80:14-81:13. On Schedule B, Mr. Lo responded "none" to Items 26, 27, and 28, relating to, respectively, "[o]ffice equipment, furnishings, and supplies," "[m]achinery, fixtures, equipment and supplies used in business," and "[i]nventory." Case No. 05-31722, ECF No. 1.

Based on the record there is also no doubt as to Mr. Lo's fraudulent intent. It is undisputed that he spent the majority of his time at the Copiague Property and had done so for approximately 18 years prior to filing his Chapter 7 case. Furthermore, he was represented by counsel and had ample opportunity to make the required disclosures. The Debtor could have listed the Copiague Property as his mailing address or business address, as he did on his tax returns. *See also* E.D.N.Y. LBR 1005-1 (effective July 1, 1999); Case No. 05-31722, ECF No. 1 (SOFA Item 15) ("If the debtor has moved within the **two years** immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case."). As explained by one court, "since interested parties should not be required to drag the truth from the debtor, a showing of good faith in a § 727(a)(4)(A) matter will often come down to whether a debtor has abided by this cardinal rule: when in doubt, disclose." *U.S. Trustee v. Halishak (In re Halishak)*, 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005).

The Debtor's omission of the Copiague Property clearly cannot be chalked up to mere inadvertence or carelessness. The Debtor had legitimate reasons to select the Copiague Property as his residence and file in Central Islip. His good faith obligations aside, it appears that it would have been more convenient for the Debtor to have filed in Central Islip. He spent more time at the Copiague Property and it is closer to the Central Islip courthouse than it is to the Brooklyn courthouse. The evidence, including Mr. Lo's 2004 and 2005 tax returns, also suggests that the Debtor maintained his records at the Copiague Property. These facts, taken together with the Debtor's questionable credibility, and his false oaths concerning his income that will be discussed below, further support an inference of fraudulent intent.

At the very least, fraudulent intent has been established on the grounds of reckless disregard or indifference to the truth. But this record suggests more. Although Plaintiff was not

required to establish Mr. Lo's motive in order to demonstrate fraudulent intent, the record of this case supports the theory that Pa's purchase of the property was part of a scheme by Mr. Lo to shield his assets from creditors: (i) the Debtor defaulted on his second mortgage at a time when he had sufficient funds to pay his counsel and accountant in NJFL's bankruptcy case, as well as to continue to pay the first mortgagee; (ii) he continued to pay the first mortgagee up until the time of the foreclosure sale; (iii) the debt owed on the second mortgage was some $90,000; (iv) Pa purchased the property at auction for only $125,000; and (v) Pa received a second mortgage from Metropolitan despite the prior default. *See, e.g.*, ECF No. 45 ¶¶ 23-25. Furthermore, Pa's purchase of the Copiague Property occurred just weeks before Plaintiff obtained its judgment against the Debtor. ECF Nos. 45 ¶¶ 2, 25; 45-29. Finally, as a family member who had received the benefit of living at Mr. Lo's home and of having NJFL falsely list her as a salaried officer, she had good reason to help him.[9]

As the circumstances of this case create such a strong inference of fraudulent intent, Mr. Lo's one shot at salvaging his discharge was to provide a plausible explanation in rebuttal. Yet the Debtor's response comes in the form of his lawyer's argument, not a personal affidavit, and consists mainly of the argument that (i) he resides at both properties and opted to list the Brooklyn Property because "home is where the heart is" and (ii) the Copiague Property is worthless to Mr. Lo's estate.[10] These arguments fail for a number of reasons. They are too narrow in that they focus exclusively on Mr. Lo's affirmative statement of listing the Brooklyn

---

[9] Based on the record, the Debtor had additional fraudulent reasons to conceal the Copiague Property. These include: (i) forestalling an association with the Best Jewelry case by avoiding having his case assigned to Central Islip, and (ii) preventing the inquiry that might have resulted from his residence at a valuable property, especially in light of the paltry income and personal belongings he scheduled.

[10] One troubling aspect of the Debtor's failure to testify or to submit an affidavit is that the positions taken by the Debtor in the parties' joint pre-trial statement ("Joint Statement") (ECF No. 25), are often contradicted by the record and by his proposed findings of fact and conclusions of law. For example, it is difficult to reconcile the Debtor's and Jantima's deposition testimony or the duel-residence theory with the Debtor's contention in the Joint Statement that he "now rarely goes" to the Copiague Property (ECF No. 25 ¶ 9), and that his "legal and actual address is the Brooklyn address" (*Id.* ¶ 11).

Property and the potential value of the Copiague Property as an asset of his estate. The concealment of the Copiague Property is plainly at odds with the Debtor's obligation of good faith disclosure, *even if* it is correct to say that he resides in both Brooklyn and Copiague and considers the Brooklyn Property to be his home. Similarly, because the Copiague Property was material to the Debtor's bankruptcy case regardless of whether it was an asset of the estate, the argument that the Debtor did not own the Copiague Property does not meaningfully address the issue of fraudulent intent.

Based on the record of this case, the Debtor's contentions, including the glib aphorism "home is where the heart is," are utterly unpersuasive. They lack *substance*. The Debtor has not offered a legitimate explanation for why he failed to disclose the Copiague Property when the record shows that he had every reason to do just that. The Debtor's response does not even attempt to address the majority of the substantive allegations made in the Abramovitz Declaration. Characterizing Plaintiff's argument as "innuendo" falls far short of (i) denying the underlying allegations and (ii) offering a credible account of his conduct that is consistent with an attempt to provide good faith, honest, and full disclosure. Remarkably, the Debtor does not even account for the most basic anomalies on this record, such as why he utilized the Copiague Property exclusively on his 2004 and 2005 tax returns but failed to disclose it in his bankruptcy case.[11] In short, the Debtor has not provided a credible, innocent explanation to excuse the material omission of the Copiague Property. Indeed, his lackluster rebuttal only supports the conclusion that he acted with fraudulent intent. *See, e.g.*, *Bernstein*, 447 B.R. at 702.

---

[11] Plaintiff's counsel notes in the Joint Statement that the Debtor used the Copiague Property in his tax returns, and Debtor's counsel responds: "[Debtor's] wife wanted to file income taxes separately. [Debtor's] legal address is at the Brooklyn home." ECF No. 25 ¶ 7. The reason given for why the Debtor did not amend the petition to correct his address is: "[Debtor's] legal and actual address is the Brooklyn address so no need to amend." *Id.* ¶ 11.

# V.

Plaintiff argues that the amounts and nature of employment listed on Mr. Lo's original and amended Schedule I and SOFA are false and internally inconsistent and cannot be reconciled with his 2004 and 2005 tax returns. ECF No. 46 ¶¶ 18-21. For example, the amended SOFA states that the Debtor received from his sisters and son $5,500 in 2004 and $6,300 in 2005, whereas his amended Schedule I reflects only $200 a month in family assistance. *Id.* ¶ 19. At the same time, these figures are contradicted by the Debtor's 2004 and 2005 tax returns. *Id.*

The Debtor admits to the falsity of his original Schedule I in that it reported that he was a salesman at Best Jewelry for three years, earned wages of $500 per month, and received family assistance of $200 per month. ECF No. 47 ¶ 16. He states that "[h]e later amended Schedule I on June 18, 2008, after retaining his present counsel, to reflect that he only received family assistance of $200.00 per month." *Id.* And he incredulously contends that his "trouble accurately classifying his income on his petition does not mean that he was giving a false oath," as "[i]t is not relevant whether his income was what it was originally stated or the lesser sums." *Id.* ¶ 21.

On the record of this case, the elements of 11 U.S.C. § 727(a)(4)(A) have been satisfied with respect to the Debtor's characterization of his income. The types of errors found in Mr. Lo's schedules and statements concerning his income and the source of that income are not consistent with a good faith effort by a mature and experienced businessman who was represented by counsel to provide an accurate account of his financial state of affairs. The Debtor, through his counsel, admits to the falsity of his original Schedule I and SOFA. ECF No. 47 ¶¶ 16, 21. Contrary to the Debtor's arguments, the materiality requirement is easily met as a debtor's income and the sources of that income relate to the estate and the discovery of assets.

The Debtor failed to rectify matters with his amendments. For one thing, the Debtor ostensibly came clean over a year after this adversary proceeding was filed. *See, e.g.*, *Sapru*, 127

B.R. at 317; *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992-93 (Bankr. E.D. Ark. 1993). For another, as Plaintiff argues, the amended documents are internally inconsistent and cannot be reconciled with his 2004 and 2005 tax returns. In addition, Item 18a of the SOFA appeared to require the disclosure of the purported marketing consultant position at the Copiague Property that was reported in the Debtor's tax returns.

It is also hard to imagine that Mr. Lo received nothing more than a small allowance from his son in exchange for his work at Best Jewelry. Mr. Lo was far more experienced in the jewelry business and helped start the store at the location of his former businesses. Indeed, Viriya had not even held a job before he purportedly started Best Jewelry. ECF No. 45-1 at 15:4-6. Mr. Lo testified that he was present at Best Jewelry every other day between June 2004 and June 2005. ECF No. 45-27 at 117:6-10. Under these circumstances, it is simply not credible that his reward was the occasional, *de minimis* handout.

At the same time, if Mr. Lo's representations about his income are true, it is hard to fathom why or how he paid $2,000 to his attorney, along with the $209 filing fee, at the inception of his bankruptcy case on October 14, 2005 (Case No. 05-31722, ECF No. 1 (SOFA Item 9)), $1,500 in legal fees to Gelberg in November 2005 in connection with Best Jewelry's filing (ECF No. 40-2), or an additional $500 in January 2007 to Gelberg in his own bankruptcy case (Case No. 05-31722, ECF No. 32).[12] In fact, based on the Debtor's purported income, it is unclear how he was able to contribute a mere $100 a month to his daughter or even why he would have a good faith aspirational belief that he could do so. Case No. 05-31722, ECF No. 1 (Schedule J).

---

[12] In the Joint Statement, the Debtor's counsel makes the unsupported claim that Mr. Lo "received money to pay for the bankruptcy filing for himself and for Best Jewelry from his sister and his son, although he physically gave the money to the attorney." ECF No. 25 ¶ 5.

## VI.

Schedule B requires a debtor to disclose his interest in various forms of property. In response to Item 12, which asks a debtor to disclose any "[s]tock and interests in incorporated and unincorporated businesses," the Debtor marked the box indicating "none." Plaintiff argues that the Debtor's failure to disclose an interest in Best Jewelry in response to Item 12 constitutes a false oath. ECF No. 46 ¶¶ 10-11. Plaintiff points out that (i) Best Jewelry was established at 460 Sunrise, the same location as the Debtor's previous businesses (*Id.* ¶ 11); (ii) as a 22-year-old fulltime college student with no business experience who had just arrived in the United States, Viriya was an unlikely business owner (*Id.* ¶ 12); (iii) the Debtor paid Gelberg's fees in Best Jewelry's bankruptcy case (*Id.* ¶ 15); and (iv) Viriya's 2004 federal income tax return does not reflect any income from or involvement with Best Jewelry (*Id.* ¶ 16).

Mr. Abramovitz's uncontested averment is that, "I never saw the Debtor's son working at the store. Rather, the store was run by the Debtor and he confirmed to me many times that he owned the store." ECF No. 45 ¶ 12. He continues that:

> The Debtor advised me that Best Jewelry was a continuation of [NJFL] and that family members were forcing the Debtor to operate the company in his son's name. Specifically, the Debtor's sisters Pa and [Pornpimon], did not want the Debtor to be the record owner of Best Jewelry because they did not trust Jantima, the Debtor's wife. Jantima came from a poor family, was many years younger than the Debtor and they believed that Jantima married the Debtor only for his and his family's money. . . . By making Viriya the owner of Best Jewelry, the family would protect the assets of Best Jewelry from Jantima.

*Id.* Plaintiff also refers the Court to the various documents signed by the Debtor as an owner or manager of Best Jewelry. ECF No. 46 ¶ 14 (citing ECF Nos. 45-5; 45-6; 45-7; 45-8; 45-9; 45-10; 45-11).

The Debtor, through his counsel, responds by citing to evidence intended to show that

Viriya "was and always had been the principal" of Best Jewelry. ECF No. 47 ¶ 10. The first

piece of evidence is the December 20, 2005 order in Best Jewelry's bankruptcy case designating

Viriya as the principal of Best Jewelry. *Id.* (citing ECF No. 36-1). The Debtor also points to (i)

Viriya's testimony that Best Jewelry was started with loans from Pa and Rattanavade (*Id.* ¶ 11);

(ii) Viriya's and the Debtor's testimony concerning the establishment of the store (*Id.* ¶ 12); (iii)

Viriya's testimony concerning the details of his operation of the store (*Id.* ¶ 13); and (iv)

Jantima's testimony that the Debtor did not own Best Jewelry and only helped Viriya because he

needed advice (*Id.* ¶ 14). The Debtor's counsel concludes that:

> The Debtor may have signed a few certain documents in years past
> as manager, cashier or even owner, but that does not mean he gave
> a false statement in his bankruptcy case as to his ownership of Best
> Jewelry. Both the Debtor and Viriya admit that the Debtor worked
> or assisted his son at Best Jewelry. The Debtor may have misstated
> his position at times on a few documents to make it easier for his
> son but it did not mean he was the legal owner of Best Jewelry or
> even had a beneficial interest. The Trustee in Best Jewelry's
> bankruptcy case certainly believed Viriya to be the principal and
> requested and received a court order to that effect. The Trustee was
> satisfied with his examination of Viriya in that case. The assets of
> Best Jewelry were liquidated by the Trustee in its Chapter 7 case
> and the case was closed.

*Id.* ¶ 15 (internal citations omitted).

The evidence shows that Best Jewelry was established when Viriya was a new immigrant

to the United States. At the time, he was a 22-year-old college student without business

experience. ECF No. 45-1 at 42:13-44:7; 14:11-15:6. His deposition testimony raises serious

doubts about whether he had an understanding of Best Jewelry's business despite his purported

10-year ownership of it and how he was able to run a business while also going to go school or

working at other jobs. Meanwhile, his 2004 tax return makes no mention of Best Jewelry and

shows that he earned his income elsewhere. ECF No. 45-4.

Furthermore, Best Jewelry used the same phone number, Golden Apple trade name,

signage, and fixtures, including a vault and safes, as the Debtor's former businesses. *See, e.g.*, ECF Nos. 45-27 at 111:9-113:2; 120:19-123:2; 45-1 at 47:12-48:24; 70:4-21; 72:23-73:6; 80:14-81:13. It also had the same suppliers and used the same accountants. ECF No. 45-27 at 114:10-115:20; 118:24-119:6. Best Jewelry's website claimed that it "has been a manufacturer of fine jewelry since 1985," the year the Debtor opened his first jewelry business. ECF Nos. 45-27 at 123:8-124:12; 45-1 at 39:17-42:12. Mr. Abramowitz averred that Mr. Lo told him that Best Jewelry was a continuation of NJFL, and that he, not Viriya, was the true owner. ECF No. 45 ¶ 12. The Debtor has not denied that he made these statements or otherwise provided a substantive response to this testimony. Finally, Mr. Lo paid legal fees in Best Jewelry's case. ECF No. 40-2.

Although the Court is inclined to conclude that Plaintiff has satisfied the elements of 11 U.S.C. § 727(a)(4)(A) with respect to the Debtor's failure to disclose an interest in Best Jewelry, there is no need to make such a definitive finding in that regard. False oaths have already been established under 11 U.S.C. § 727(a)(4)(A) relating to the omission of the Copiague Property and the Debtor's income. Under "[t]he plain language of this statute . . . one single false oath or account is sufficient to deny a debtor's discharge." *Nazzaro*, 2013 WL 145627, at *7; *see also Feynman v. Rosenthal (In re Feynman)*, 77 F.2d 320, 321 (2d Cir. 1935) ("Courts will not measure the dishonesty of a bankrupt, once that be shown").

## VII.

Accordingly, based on the foregoing, the Debtor is denied a discharge of his debts pursuant to 11 U.S.C. § 727(a)(4)(A).

**SO ORDERED:**

Dated: Brooklyn, New York
        February 27, 2013

                                        s/ Jerome Feller
                                        JEROME FELLER
                                        UNITED STATES BANKRUPTCY JUDGE